# United States Court of Appeals for the Federal Circuit

---

**WHITEWATER WEST INDUSTRIES, LTD., A CANADIAN CORPORATION,**
*Plaintiff-Appellee*

**v.**

**RICHARD ALLESHOUSE, AN INDIVIDUAL, YONG YEH, AN INDIVIDUAL, PACIFIC SURF DESIGNS, INC., A DELAWARE CORPORATION,**
*Defendants-Appellants*

---

2019-1852, 2019-2323

---

Appeals from the United States District Court for the Southern District of California in No. 3:17-cv-00501-DMS-NLS, Judge Dana M. Sabraw.

---

Decided: November 19, 2020

---

JOSEPH RICK TACHE and ROGER L. SCOTT, Buchalter, A Professional Corporation, Irvine, CA, argued for plaintiff-appellee. Also represented by KARI BARNES.

MANUEL FEDERICO DE LA CERRA, The Law Office of Manuel de la Cerra, Carlsbad, CA, argued for defendants-appellants. Also represented by JEFF RAMBIN, Fairchild, Price, Haley & Smith, LLP, Nacogdoches, TX; JOHN ROBERTS, Roberts IP Law, Columbus, IN.

———————————

Before DYK, MOORE, and TARANTO, *Circuit Judges.*

TARANTO, *Circuit Judge.*

Richard Alleshouse and Yong Yeh are named as the inventors on U.S. Patent Nos. 9,044,685 and 9,302,189, which claim water-park attractions that individuals may ride as if surfing, and on U.S. Patent No. 9,592,433, which claims nozzle configurations for regulating water flow in such surfing attractions. Pacific Surf Designs Inc., the company Messrs. Alleshouse and Yeh formed and operate to develop and market such attractions, is the assignee of the three patents. Whitewater West Industries, Ltd. (Whitewater) is the successor, for present purposes, of Wave Loch, Inc., which employed Mr. Alleshouse until just before he went into business with Mr. Yeh and the patented inventions were conceived.

Whitewater sued Mr. Alleshouse, Mr. Yeh, and Pacific Surf Design in the United States District Court for the Southern District of California, asserting claims for breach of contract and correction of inventorship. Specifically, Whitewater claimed that Mr. Alleshouse had to assign each of the '685, '189, and '433 patents to Whitewater, as Wave Loch's successor, under the terms of Mr. Alleshouse's employment contract with Wave Loch. Whitewater also claimed that Mr. Yeh—who had not been employed by Whitewater or its predecessors and therefore was not under any alleged assignment duty—was improperly listed as an inventor on each of the three patents. The district court held that (a) Mr. Alleshouse breached the employment agreement, the agreement was valid under state law, and Whitewater was therefore entitled to assignment of the defendants' patent interests, and (b) Mr. Yeh was improperly joined as an inventor. *Whitewater West Indus., Inc. v. Alleshouse*, No. 17-cv-00501, 2019 WL 4261884 (S.D. Cal. Mar. 27, 2019) (*March Decision*); *Whitewater West Indus.,*

*Inc. v. Alleshouse*, No. 17-cv-00501, 2019 WL 4261883 (S.D. Cal. Aug. 1, 2019) (*August Decision*).

We reverse. In particular, we reverse the judgment of breach of contract because we hold that the assignment provision is void under California law. It follows from that holding, as Whitewater does not dispute, that Whitewater lacks standing to contest inventorship. We therefore also reverse the judgment on the inventorship count without separately addressing the merits of inventorship. The defendants are entitled to judgment in their favor in this action.

I

A

Two provisions of California law are central on appeal. First, California Business and Professions Code § 16600 states: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Second, California Labor Code § 2870(a) provides:

Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2) Result from any work performed by the employee for the employer.

Related to § 2870, California Labor Code § 2872 requires that an employer must "provide a written notification" to an employee that any assignment provision "does not apply to an invention which qualifies fully under the provisions of Section 2870."

B

The '685 and '189 patents, which share a specification and are both titled "Water Attractions Involving a Flowing Body of Water," describe and claim "water attractions involving a flowing body of water on a surface" that allows riders "to engage in boardriding maneuvers" that differ from "naturally occurring ocean wave shapes." '685 patent, col. 1, lines 52–56. Mr. Alleshouse and Mr. Yeh applied for the '685 patent in October 2013, based on a provisional application filed in October 2012, and it was issued in June 2015; they filed a continuing application in May 2015 that issued as the '189 patent in April 2016. The '433 patent, which issued in March 2017 and is titled "Nozzle Shapes and Configurations for Water Attractions Involving a Flowing Body of Water," describes and claims "nozzle shapes and configurations which create a flowing body of water over a surface in a substantially uniform, radial orientation over a substantially changing ride surface." '433 patent, col. 2, lines 17–20. Mr. Alleshouse and Mr. Yeh filed the application that issued as the '433 patent in October 2013 based on a provisional application filed in October 2012.

Mr. Alleshouse had begun working in the field of large-scale, sheet-wave attractions when he was hired by Wave Loch as a Field Engineer in October 2007. A sheet wave is a formation of water in a planar "sheet flow" with sufficient depth to replicate characteristics of a naturally occurring wave. '685 patent, col. 1, lines 24–33. Mr. Alleshouse's responsibilities at Wave Loch included, in part, "assessing and documenting the physical condition of each ride visited, along with its operating parameters," and "work[ing] closely with the WaveLoch engineering staff doing research

and design work improving existing rides, and developing new rides utilizing 3D parametric modeling, numerical analysis, and other engineering principles." J.A. 2257.

On September 8, 2008, Mr. Alleshouse signed a "Covenant Against Disclosure and Covenant Not to Compete" with Wave Loch (Agreement). J.A. 1021–25. The Agreement includes the following assignment provision:

> a.  Assignment: In consideration of compensation paid by Company, Employee agrees that all right, title and interest in all inventions, improvements, developments, trade-secret, copyrightable or patentable material that Employee conceives or hereafter may make or conceive, whether solely or jointly with others:
>
> (a) with the use of Company's time, materials, or facilities; or
>
> (b) resulting from or suggested by Employee's work for Company; or
>
> (c) in any way connected to any subject matter within the existing or contemplated business of Company
>
> shall automatically be deemed to become the property of Company as soon as made or conceived, and Employee agrees to assign to Company, its successors, assigns, or nominees, all of Employee's rights and interests in said inventions, improvements, and developments in all countries worldwide. Employee's obligation to assign the rights to such inventions shall survive the discontinuance or termination of this Agreement for any reason.

J.A. 1022. The Agreement is governed by California law. J.A. 1024. It is undisputed on appeal that Whitewater, as successor to Wave Loch, is now Mr. Alleshouse's counterparty on this Agreement.

Beyond the responsibilities stated in his job description at Wave Loch, Mr. Alleshouse was the product manager for Wave Loch's FlowRider attraction—a sheet wave attraction that uses a rectangular flow nozzle to direct water uphill within a rectangular footprint—and was responsible for design drawings for that product. He also worked on Wave Loch's WaveOz attraction—a 180-degree bowl-shaped water riding attraction that uses an array of nozzles directed outward along the bowl radius. In addition, Mr. Alleshouse participated in discussions about potential attractions the company might produce, including one the company decided not to pursue, namely, an attraction that might compete with the Stingray attraction released by rival Murphy Waves in 2010 or 2011—a sheet-wave ride in the shape of a halfpipe, traditionally associated with skateboarding, that would allow individuals to ride the water along the side walls.

In early July 2012, Mr. Alleshouse contacted Mr. Yeh, a licensed attorney, to discuss Mr. Alleshouse's obligations under the Agreement, and a few days later, the two discussed the possibility of starting their own venture, to become known as Pacific Surf Designs. On July 27, 2012, Mr. Alleshouse resigned from Wave Loch, indicating that his last day with the company would be August 3, 2012. On August 4, 2012, Mr. Alleshouse began keeping a notebook of ideas for potential products to be sold by his and Mr. Yeh's new venture. In early September, Mr. Yeh joined Mr. Alleshouse to "start testing out models, concepts, [and] ideas, in person."

On October 13, 2012, Messrs. Alleshouse and Yeh filed a provisional application that ultimately culminated in the issued '685 and '189 patents. On October 24, 2012, Messrs. Alleshouse and Yeh filed a provisional application that resulted in the '433 patent.

C

On March 13, 2017, Whitewater brought this action against Messrs. Alleshouse and Yeh and Pacific Surf Designs. In its amended complaint, Whitewater alleged that the Agreement required Mr. Alleshouse to assign his rights in the three patents to Whitewater and that Mr. Yeh should be removed from inventorship status on all three patents. J.A. 78–91. It is undisputed that the result of Whitewater's prevailing on these claims would be that Whitewater alone would own the three patents, which it could enforce against the defendants.[1]

After a bench trial, the district court ruled for Whitewater. The court first rejected the defendants' contention that the Agreement's assignment provision is invalid under California law—specifically, under California Labor Code §§ 2870, 2872, and under California Business and Professions Code § 16600. *March Decision* at *6–9. The court then held that Mr. Alleshouse breached the assignment provision by failing to assign the patent rights at issue (and rejected defenses of equitable estoppel and laches). *Id.* at *9–11. Finally, the court held that Mr. Yeh was not properly listed as an inventor on the patents. *Id.* at *12–13.

As to invalidity of the assignment provision (the dispositive issue on appeal), the district court began by rejecting the defense of invalidity under California Labor Code §§ 2870 and 2872. Addressing § 2870, the district court stated that Alleshouse "fail[ed] to explain how requiring an employee to assign inventions 'suggested by' his work for

---

[1]    Whitewater also asserted claims for intentional interference with contract and violation of California Business and Professions Code § 17200. The district court rejected those claims, *March Decision* at *11, and Whitewater has not sought to revive them on appeal.

the employer exceeds the scope of Section 2870, which permits an employer to require an employee assign inventions '[r]elate[d] to' the employer's business." *Id.* at *7–8 (second alteration in original). Relying on *Cadence Design Systems, Inc. v. Bhandari*, No. 07-823, 2007 WL 3343085, at *5 (N.D. Cal. Nov. 8, 2007), the district court stated that § 2870 "permits the assignment of inventions conceived after employment, so long as the inventive idea relates to the employer's business . . . or results from work performed by the employee for the employer." *Id.* at *8. As for § 2872's requirement of a notification, the district court concluded that the section states no remedy for its violation and that absence of a § 2872 notification from Wave Loch was "not determinative" because "the subject matter of the patents in suit was integral to Mr. Alleshouse's work at Wave Loch and would not have been subject to the notice requirements of Section 2872." *Id.* at *7. The district court later added that it had considered the absence of notification but deemed it insufficient for an invalidity conclusion. *August Decision* at *4.

The district court then briefly rejected the defense of invalidity under California Business and Professions Code § 16600. Relying on *Board of Trustees of Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, 583 F.3d 832, 845 (Fed. Cir. 2009), *aff'd on other grounds*, 563 U.S. 776 (2011), the district court concluded that "the Agreement does not restrain Mr. Alleshouse from engaging in the sheet wave profession." *March Decision* at *9. The district court reasoned that the Agreement "only requires him to assign inventions resulting from his work at Wave Loch or relating to Wave Loch's business at the time he was there." *Id.*

Having held the Agreement's assignment provision to be valid, the district court went on to find a breach. It explained that the "evidence shows Mr. Alleshouse's half-pipe/quarter-pipe invention was related to, and emanated from, Wave Loch's business and research." *Id.* at *10.

Citing Mr. Alleshouse's responsibility as the "product manager for the Flowrider attraction at Wave Loch"; Wave Loch's development of "radial, non-planar nozzles for its WaveOz attraction"; and Mr. Alleshouse's access to "models and drawings," as well as "complete diagrams of similar nozzle structures," the district court stated that "[c]ommon sense shows that the inventions at issue resulted from Mr. Alleshouse's work at Wave Loch." *Id.* On appeal, the defendants do not dispute the finding that the inventions come under the Agreement's assignment provision (or the rejection of the equitable estoppel and laches defenses).

The district court next ruled for Whitewater on its claim that Mr. Yeh was improperly named as an inventor on the three patents at issue. *Id.* at *12–13. The court determined that "Mr. Alleshouse alone conceived of the inventions" and that "Mr. Yeh's contributions occurred thereafter and are insufficient under the law." *Id.* at *12. The district court later amended—largely supplemented—its findings on this issue. *August Decision* at *2–3.

The defendants timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

II

On appeal, the defendants challenge the Agreement's assignment provision as invalid both under § 16600 and under §§ 2870 and 2872. On appeal, the parties accept two important factual premises: first, the inventions at issue were not conceived until after Mr. Alleshouse left his job at Wave Loch; second, Mr. Alleshouse did not use any trade-secret or other confidential information belonging to Wave Loch (now Whitewater) in arriving at the patented inventions. The defendants, who do not appeal the determination of breach, also now accept that the assignment provision applies to post-employment inventions. Relying on those now-undisputed premises, we conclude that the assignment provision is invalid under § 16600, and we reject Whitewater's argument that § 2870 saves the provision

from invalidity under § 16600. We need not address the defendants' argument for invalidation under § 2872, which Whitewater does not contend saves the assignment provision from invalidity under § 16600. We therefore reverse the district court's ruling on breach of contract.

A

The parties have not cited any decision of California's Supreme Court or of its intermediate appellate courts that directly address how broadly, if at all, employment contract provisions may require assignment of inventions conceived post-employment and without use of the former employer's confidential information. In this situation, we must try to predict, based on precedents that are relevant but not directly on point, how the State's highest court would rule on the issue before us. *See Comm'r of Internal Revenue v. Bosch's Estate*, 387 U.S. 456, 465 (1967); *see also Golden v. Cal. Emergency Physicians Med. Grp.*, 782 F.3d 1083, 1089 (9th Cir. 2015) (*Golden I*) (same); *Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir. 2002) (same).

We review a district court's interpretation of a State's statutes de novo. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 239 (1991). In doing so, we give weight to decisions of federal courts that are "better schooled in" the law of the particular State involved. *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 500 (1985) ("district courts and courts of appeals are better schooled in and more able to interpret the laws of their respective States"); *Propper v. Clark*, 337 U.S. 472, 486–87 (1949) ("In dealing with issues of state law that enter into judgments of federal courts, we are hesitant to overrule decisions by federal courts skilled in the law of particular states unless their conclusions are shown to be unreasonable."); *see also*, *e.g.*, *In re SuperValu, Inc.*, 925 F.3d 955, 963 (8th Cir. 2019) (discussing recent Seventh Circuit interpretation of Illinois law and "adopt[ing] its conclusion"); *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 281 (2d Cir. 1981) ("It has frequently been observed

that a court of appeals should give considerable weight to state law rulings made by district judges, within the circuit, who possess familiarity with the law of the state in which their district is located."). In this case, the most on-point California federal-court decisions rendered before the ruling under review here support the defendants in their challenge to the contrary ruling of the California district court in this case.

## B

The Agreement's assignment provision has a broad restraining effect that renders it invalid under § 16600 as that statute has been applied to employment contracts in a manner highly protective of former employees. We assess the provision based on its broad terms. Whitewater did not timely make any argument in this court that the provision could be upheld if we concluded that § 16600 might permit a narrower provision that covered Mr. Alleshouse's particular circumstance.[2]

## 1

The Agreement's assignment provision is broad. It requires, among other things, that Mr. Alleshouse, as a

---

[2] Whitewater made no such argument in its brief in this court. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived."). It has not addressed whether § 16600 allows such a judicial approach to overbroad agreements. *See Kolani v. Gluska*, 64 Cal. App. 4th 402, 406–07 (1998); *Applied Materials, Inc. v. Advanced Micro-Fabrication Equipment (Shanghai) Co.*, 630 F. Supp. 2d 1084, 1091 (N.D. Cal. 2009); *cf. Guth v. Minnesota Min. & Mfg. Co.*, 72 F.2d 385, 389 (7th Cir. 1934) (discussing question of parsing agreement having invalid and valid parts).

former employee, assign to Wave Loch (or its successors, assignees, or nominees) all of his rights or interests in any invention he "may make or conceive," "whether solely or jointly with others," if the invention is *either* "resulting from or suggested by" his "work for" Wave Loch *or* "in any way connected to any subject matter within the existing or contemplated business of" Wave Loch. J.A. 1022. The assignment duty applies to all of Mr. Alleshouse's "rights and interests in said inventions . . . in all countries worldwide." *Id.*

No trade-secret or other confidential information need have been used to conceive the invention or reduce it to practice for the assignment provision to apply. The obligation is unlimited in time and geography. It applies when Mr. Alleshouse's post-employment invention is merely "suggested by" his work for Wave Loch. It applies, too, when his post-employment invention is "in any way connected to any subject matter" that was within Wave Loch's "existing or contemplated" business when Mr. Alleshouse worked for Wave Loch.

The restraining effect of these requirements is evident. For a number of years, Mr. Alleshouse worked for Wave Loch in a wide variety of capacities involving design and implementation of water attractions. Anyone in his position would have developed useful, specialized knowledge of the business of water attractions, wholly apart from any confidential information. Work in the same line of business was necessarily among the best and likeliest prospects for such an individual to pursue when leaving the employer.

Yet under the Agreement's assignment provision, pursuit of the very prospects for which the individual "is particularly fitted," as the Seventh Circuit noted in 1934, carries a heavy price. *Guth*, 72 F.2d at 389. A wide range of inventions made after leaving the employer, for all time, would have to be assigned to that (now former) employer. The individual, and the individual's new employer or

enterprise, would lose the likely competitive benefits of the exclusivity rights provided by patents on such new inventions—or, worse, could be subject to being sued by the former employer, as assignee, for infringement of those very patents. The impairment of the individual's ability to pursue his profession, trade, or business would be significant.

A century ago, the Second Circuit explained that even an agreement providing just for an "exclusive license to use all other future patents and inventions devised or acquired" by a former employee—short of an actual assignment—"would be an extremely harsh one; it might even be found unconscionable, for it mortgages his inventive faculties to complainant for an indefinite period subsequent to employment." *Standard Plunger Elevator Co. v. Stokes*, 212 F. 893, 896 (2d Cir. 1914). A requirement of assignment, like the one at issue here, imposes an even harsher penalty on post-employment professional, trade, or business prospects—a penalty that has undoubted restraining effect on those prospects and that a number of courts have long held to invalidate certain broad agreements with those effects. *See, e.g.*, *Guth*, 72 F.2d at 388–89 (partly invalidating, as "conflict[ing] with the public policy of the land," broad agreement that required former employee to "turn over the children of his inventive genius" conceived after employment); *id.* at 387–89 (collecting case law); *TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*, 966 F.3d 46, 57–58 (1st Cir. 2020) (applying policy against overbroad non-compete clauses to overbroad non-disclosure agreements and collecting cases).

Identifying this substantial restraining effect on former employees does not suffice to answer the question whether a particular law-making authority has chosen to invalidate an agreement having such an effect. A law-making authority, in deciding on a policy to govern the issue, presumably would consider a variety of facially pertinent interests, among them the interests of former employees, the interests of employers, the overall societal interest, and

14          WHITEWATER WEST INDUSTRIES v. ALLESHOUSE

practicalities of implementing any policy chosen.[3]  The question for us is how California has resolved the issue—where there is no use of confidential information and the conceptions of the inventions post-date employment.

2

Our best assessment of California law on the subject is that California has chosen, in § 16600, to forbid the restraint on former employees imposed by the agreement in this case.  We begin with the California Supreme Court's relevant pronouncements.  That court recently reiterated that "[t]he language of section 16600 is broad on its face." *Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 582 (Cal. 2020).[4]  And in that decision, the court, in adopting a flexible rule-of-reason approach to assess certain contracts between businesses, distinguished and emphasized just how "strictly," *id.* at 586, 588, § 16600 forbids agreements that impair the post-employment liberty of former employees, relying on a long line of cases culminating in *Edwards v.*

––––––––––

[3]     For example, Whitewater notes a concern about the potential for "dishonest employees to withhold their best efforts and ideas from their current employers."  Whitewater Resp. Br. 16.  That concern could be a part of the balance of relevant considerations, and it also might be addressed by means other than assignment provisions, *e.g.*, disclosure requirements, *see* California Labor Code § 2871, or a duty of loyalty, *see* California Labor Code § 2859.  *See Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 997 (N.D. Cal. 2006) (acknowledging assignment under duty of loyalty to employer); *Cubic Corp.*, 185 Cal. App. 3d at 444, 451 (discussing implications of disclosure requirement as part of employment contract).  Whitewater asserted no such separate basis of liability in this case.

[4]     Section 16600 is subject to exceptions "provided in this chapter," *i.e.*, §§ 16601, 16602, and 16602.5.  Those exceptions have not been invoked here.

*Arthur Andersen LLP*, 189 P.3d 285 (Cal. 2008). *Ixchel*, 470 P.3d at 583–88.

In *Edwards*, the California Supreme Court invalidated contractual provisions barring a former employee from working for or soliciting certain clients of his previous employer for limited periods following his termination. 189 P.3d at 288. In reaching its conclusion, the court rejected the notion that "a mere limitation on an employee's ability to practice his or her vocation would be permissible under section 16600, as long as it was reasonably based," explaining that the statute's use of the word "restrain" does not "mean simply to 'prohibit,'" *id.* at 291, and that the statute "evinces a settled legislative policy in favor of open competition and employee mobility," *id.*, and "embodies the original, strict common law antipathy toward restraints of trade," *id.* at 292–93. The court also rejected a "narrow-restraint exception" test for § 16600, articulated by the Ninth Circuit, as contravening California's protection of employees. *Id.* at 293. The court emphasized that "California courts have been clear in their expression that section 16600 represents a strong public policy of the state which should not be diluted by judicial fiat." *Id.* at 293 (internal quotation marks omitted).

In *Ixchel*, the California Supreme Court reiterated § 16600's special protectiveness of employees. It held that courts should apply "a reasonableness standard to contractual restraints on business operations and commercial dealings," but explained that its holding "do[es] not disturb the holding in *Edwards* and other decisions strictly interpreting section 16600 to invalidate noncompetition agreements following the termination of employment or sale of interest in a business." *Ixchel*, 470 P.3d at 588. Specifically, the court explained that "the rationale in *Edwards* focused on policy considerations specific to employment mobility and competition: 'The law protects Californians and ensures "that every citizen shall retain the right to pursue any lawful employment and enterprise of their

choice.""" *Id.* at 587 (quoting *Edwards*, 189 P.3d at 291). This strict approach to § 16600 as applied to contracts restraining former employees condemns the assignment requirement at issue here given the significant restraining effect the requirement has on former employees like Mr. Alleshouse.

Since the California Supreme Court decided *Edwards*, the Ninth Circuit has confirmed the strictness and breadth of § 16600's prohibition on contracts restraining former employees, especially but not only as to competition with the former employer. In *Golden I*, the Ninth Circuit considered a "no-employment" provision from a settlement agreement stating that the former employee "shall not be entitled to work or be reinstated at any [former-employer]-contracted facility or at any facility owned or managed by" the former employer. 782 F.3d at 1085. The court explained that § 16600 is not limited to non-competition provisions, noting that "the legislature adopted categorical language: '*every* contract' that '*restrain*[s]' anyone 'from engaging in lawful profession . . . *of any kind*' is 'void.'" *Golden I*, 782 F.3d at 1090 (brackets and ellipsis in original). Recounting the California Supreme Court's decision in *Chamberlain v. Augustine*, 156 P. 479 (Cal. 1916), the Ninth Circuit highlighted the "canonical statement" that "the crux of the inquiry under section 16600 is not whether the contract constituted a covenant not to compete, but rather whether it imposes 'a restraint of a substantial character' regardless of 'the form in which it is cast.'" *Golden I*, 782 F.3d at 1091. The Ninth Circuit concluded that all contract provisions that "constitute[] a restraint of a substantial character" on a former employee's ability to engage in a legal profession are prohibited under § 16600. *Id.* at 1092–93.

The Ninth Circuit elaborated when the *Golden I* case returned to the court. In *Golden v. Cal. Emergency Physicians Med. Grp.* (*Golden II*), the Ninth Circuit explained that "a contractual provision imposes a restraint of a

substantial character if it significantly or materially impedes a person's lawful profession, trade, or business" and that "it will be the rare contractual restraint whose effect is so insubstantial that it escapes scrutiny under section 16600." 896 F.3d 1018, 1024 (9th Cir. 2018). Ultimately, considering the scope of the no-employment provision, the Ninth Circuit held that the restraint was "of a substantial character" because the former employee "would be ineligible for employment in *any* department of a hospital where [the former employer] has a contract" and "easily [rose] to the level of a substantial restraint" when considering the market presence of the former employer. *Id.* at 1025–26. The assignment provision in the present case has a restraining effect of a substantial character under the Ninth Circuit's approach.

The California Supreme Court and Ninth Circuit decisions just discussed address § 16600 in its application to restrictions on former employees, but they do not specifically address contracts requiring assignments of rights in inventions conceived after employment. Three federal district courts in California did address that particular situation before the district court decided the present case. Those decisions are in line with the principles of the California Supreme Court and Ninth Circuit and support our rejection of the ruling now before us.

In *Armorlite Lens Co. v. Campbell*, the district court applied § 16600 to a contractual provision requiring assignment of "all new ideas and concepts" that an employee developed "during the period of [his] employment, or within one (1) year after the termination thereof." 340 F. Supp. 273, 274 (S.D. Cal. 1972). The court explained that an agreement "which requires a former employee to turn over to his former employer *all* new ideas and concepts concerning the field of work or the products of the employer" within one year after termination "is unnecessarily broad." *Id.* at 275. Noting that the provision covered "ideas and concepts

not based on . . . confidential information," the court held the provision "void and unenforceable" under § 16600. *Id.*

Similarly, in *Applied Materials, Inc. v. Advanced Micro-Fabrication Equipment (Shanghai) Co.*, the district court considered, and held invalid under § 16600, an assignment provision that required assignment of "any invention . . . described in a patent application or . . . disclosed . . . within one (1) year after terminating my employment" based on a presumption "that the invention was conceived or made during the period of [the] employment." 630 F. Supp. 2d 1084, 1086 (N.D. Cal. 2009). The court explained that "[a]ssignment clauses function as unlawful non-compete provisions where they require an employee to assign an invention conceived after departing from an employer's service." *Id.* at 1090. Applied to the specific assignment provision at issue, the district court observed that it "broadly target[ed] any inventions 'relate[d] to' former employees' 'work'" with the former employer and was "in no way limited" to subject matter based on confidential material. *Id.* (second alteration in original). The court also noted that the provision covered "any invention disclosed by former employees, regardless of when or where they were conceived," so the provision was "overly broad with respect to both subject matter and temporal scope." *Id.* at 1090–91.

Most recently, in *Conversion Logic, Inc. v. Measured, Inc.*, the district court addressed, and invalidated under § 16600, three consulting agreements that, reflecting the language of the agreements, the court treated as employment agreements for purposes of § 16600. No. 2:19-cv-05546, 2019 WL 6828283, at *6 (C.D. Cal. 2019). The agreements required assignment of "all Inventions . . . conceived or developed by Employee while employed with the Company or within one (1) year following termination of such employment." *Id.* The agreements extended "beyond the length of the employment" and "include[d] broad

language sweeping up inventions and discoveries unrelated to" the companies' proprietary information. *Id.* at \*6–7.

Those decisions, all from federal district courts in California, confirm that invention-assignment provisions that go beyond protection of proprietary information and ensnare post-employment inventions are to be judged under the strict § 16600 standards that protect former employees. As far as we have been shown, there is no contrary decision of a California federal court except for the district court's decision in this case. As explained, the agreement in this case is invalid under § 16600's strict standards governing restraints on former employees.

3

This conclusion is not undermined by the sole authority on § 16600 cited by the district court, namely, this court's decision in *Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, which rejected a § 16600 challenge to an assignment provision. 583 F.3d 832, 837 (Fed. Cir. 2009), *aff'd on other grounds*, 563 U.S. 776 (2011). A researcher employed by Stanford, Holodniy, in the course of that employment, arranged to spend time at Cetus, as a visitor, to learn certain laboratory techniques as part of a Stanford-Cetus collaboration on efforts to quantify amounts of Human Immunodeficiency Virus (HIV) in human blood samples. *Id.* The researcher signed a "Visitor's Confidentiality Agreement" (VCA) with Cetus that included a patent-assignment provision granting various invention rights to Cetus. *Id.* at 837, 842. Stanford eventually secured certain patents naming the researcher as an inventor, and when Stanford sued Cetus's successor, Roche, for infringement by its marketing of certain detection kits, Roche defended on the ground, among others, that it owned the interest of the Stanford researcher based on the assignment provision. *Id.* at 839. This court agreed, in the process rejecting one of Stanford's responses,

namely, that the agreement was invalid under § 16600. *Id.* at 845–46.

One ground on which we rejected the § 16600 challenge was that there was simply no evidence of a restraining effect on Holodniy's ability to engage in his profession. "Stanford provides no evidence that the VCA restrained Holodniy from engaging in any profession. Indeed, the record shows that Holodniy freely continued his HIV research at Stanford, publishing articles and using the knowledge he obtained from Cetus to further the science behind the patents-in-suit." *Id.* at 845. That ground, essentially a threshold ground for application of § 16600, readily distinguishes the present case.

This court also stated that "California courts apply section 16600 to employment restrictions on departing employees, not to patent assignments." *Id.* at 846 (citing *Thompson v. Impaxx, Inc.*, 7 Cal. Rptr. 3d 427 (Ct. App. 2003), and *D'Sa v. Playhut*, 102 Cal. Rptr. 2d 495 (Ct. App. 2000)). Given that the two cited cases did not hold that a patent-assignment provision in an *employment* agreement cannot be subject to § 16600, the absence of discussion of what were already two decisions by California federal district courts holding otherwise, and the post-*Stanford* clarifications of § 16600 law, we interpret that sentence to reflect the fact that Holodniy's relationship with Cetus was not one of employment. It was a visitor relationship while Holodniy was employed at Stanford, and it was part of an overall relationship between the two institutions—Stanford and Cetus. Those are not the employment-agreement circumstances for which § 16600 prescribes a strict approach, as the California Supreme Court has recently confirmed; indeed, the *Stanford* circumstances are more akin to the business-to-business dealings for which *Ixchel* holds that § 16600 prescribes a much less strict approach. The present case, in contrast, falls squarely under the strict employment-agreement standard.

Those aspects of *Stanford* made it unnecessary for this court to resolve definitively whether the inventions at issue were conceived while Holodniy was learning techniques at Cetus or later. The district court in the case had ruled, on summary judgment, that they were conceived while Holodniy was visiting Cetus. *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 487 F. Supp. 2d 1099, 1107–08, 1116–17 (N.D. Cal. 2007), *aff'd*, 583 F.3d 832 (Fed. Cir. 2009), *aff'd*, 563 U.S. 776 (2011). We did not set aside that ruling or pronounce it correct or incorrect. *See Stanford*, 583 F.3d at 842. We could decide the § 16600 issue in *Stanford* without deciding the timing of the conception only because the case did not involve the circumstance—an employment agreement with an assignment requirement having a significant restraining effect on a former employee—in which that issue is critical. For the reasons already discussed, this case involves just such an agreement, and *Stanford* does not undermine the conclusion that the agreement here is invalid under § 16600.

C

Whitewater suggests that we should reach a different conclusion about § 16600 because of § 2870(a). In particular, it says that § 2870(a) clearly approves an agreement like the one at issue here and, therefore, the general statutory prescription, § 16600, should be applied narrowly so as not to override that clear approval of such an agreement by the more specific statutory prescription, § 2870(a). Whitewater Resp. Br. 33–35. This argument relies on the duty to harmonize statutes, a well-recognized principle of California law. *See State Dep't of Public Health v. Superior Court*, 342 P.3d 1217, 1225 (Cal. 2015) ("We have recently emphasized the importance of harmonizing potentially inconsistent statutes. 'A court must, where reasonably possible, harmonize statutes, reconcile seeming inconsistencies in them, and construe them to give force and effect to all of their provisions. [Citations.] This rule

applies although one of the statutes involved deals gener-
ally with a subject and another relates specifically to par-
ticular aspects of the subject.'    [Citation.]") (internal
quotation marks omitted) (citing authorities).

We part company with Whitewater not over the harmo-
nization principle but over its application in this case. Spe-
cifically, we reject Whitewater's premise that § 2870(a)
clearly covers, and through its exceptions clearly approves,
an agreement requiring assignment of post-employment
inventions.  We conclude that § 2870(a) does not clearly
cover agreements requiring assignments of post-employ-
ment inventions.  From that conclusion it follows that the
proper way to fulfill the duty to harmonize the two statu-
tory prescriptions is by reading § 2870(a) not to override
what we think is a clear application of § 16600 (rather
than, as Whitewater argues, reading § 16600 narrowly to
avoid overriding § 2870).

To begin with, the exceptions in § 2870(a) cannot be
broader in scope than the restriction to which they are ex-
ceptions.  The subsection states a restriction, followed by
exceptions.  It states that certain provisions of employment
agreements "shall not apply" to certain inventions, "except
for" certain inventions that meet any of several criteria.
The "except for" structure means that the exceptions are
necessarily a subset of the initial scope of the restriction.
The key question, then, is whether the restriction reaches
agreements to assign post-employment inventions.

Whitewater has not cited, and the district court did not
cite, any cases that apply § 2870(a) to a post-employment
invention.[5]  We must consider the statute without the aid

_____

[5]    The only case cited by the district court, *Cadence
Design*, involved an assignment requirement for an inven-
tion conceived during employment.  2007 WL 3343085,
at *4.  The contractual provision also declared expressly

of any on-point case law.  We conclude that § 2870(a) does not support Whitewater's premise.  To the contrary, it is at least a fair reading of § 2870(a)—and given the duty to harmonize it with § 16600, we think it is ultimately a necessary reading—that it simply does not apply to post-employment inventions, much less affirmatively authorize all agreements that require assignment of post-employment inventions as long as they meet the "except for" criteria, regardless of other characteristics, such as the absence of any temporal limit on the contractual assignment duty.

The opening clause of § 2870(a) defines the subsection's outer limits—before exceptions are stated that narrow the scope within those limits—by confining its scope to a "provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer."  It is only such a provision that the subsection restricts—declaring that it "shall not apply to an invention that the employee developed on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information."  It then creates an exception to that restriction in two circumstances—namely, for "inventions that either "(1) [r]elate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer" or "(2) [r]esult from any work performed by the employee for the employer."[6]

---

that it did not reach beyond what § 2870 approved.  *Id.* at *5 (relying on that declaration to find the provision consistent with § 2870).

[6] Subsection (b) then declares unenforceable any provision in an employment agreement to the extent the provision "purports to require an employee to assign an

Various features of the language of § 2870(a) at least suggest that it is referring only to inventions made by a person who, at the time of the making of the inventions, was an employee of the employer.[7]  The subsection refers to "employees" and "employers," and it never refers either to "former employees" or "former employers" or to a post-employment period.  In its wording and structure, it is naturally understood to be addressing only an employer's default right to insist on assignments from its employees of inventions they make while they are employees, and then narrowing *that* right so as to benefit employees.  Nothing in the statutory language positively indicates, let alone requires the conclusion, that the California Legislature, in § 2870, was addressing requirements to assign post-employment inventions—which present what have long been recognized as presenting significant additional policy concerns, over and above those presented by assignment requirements for inventions made during employment.  *See Guth*, 72 F.2d at 387–89 (1934 decision noting case-law recognition of distinction).  Nor has Whitewater cited any legislative history suggesting that the California Legislature was doing so.

The subsection states that its subject is a "provision" that requires "an employee" to make certain assignments.  It then declares that such a provision "shall not apply" to a group (to be further limited in the exceptions) of inventions which the "employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information."  That initial definition of the employee protection suggests a presupposition of

invention otherwise excluded from being required to be assigned under subdivision (a)."

[7]    That reading does not preclude a breach of the duty to assign during employment from being remedied post-employment.

current employee status because the definition focuses precisely on excluding use of employer resources (temporal, physical, or informational) to which current employees commonly have ready access. Section 2870(a) proceeds to further define which among such own-time/own-resources inventions of an employee the employer can still claim through mandated assignment—those which "relate at the time of conception or reduction to practice" to certain current or sufficiently anticipated activities of the employer, and those which "result from" any work of the employee for the employer. Neither exception contains any pointer toward post-employment inventions, and such a temporal extension (with no further temporal limit) would raise obvious issues. If such inventions were covered, the exceptions would, by their terms, seem to expand as the former employer's activities change over time (indefinitely into the future) and call for ever-less-certain determinations of the causal connection ("result from") back to work during employment.[8]

For such reasons, we think that § 2870(a)'s own terms suggest that it is sensibly, perhaps even best, understood to be restricted in its reach to inventions conceived during employment. That understanding, moreover, fits well with neighboring § 2871. That section authorizes employers to require employees to disclose "all of the employee's inventions made . . . during the term of his or her employment." Cal. Lab. Code § 2871. Although Whitewater contrasts the temporal language in § 2871 with the absence of similar words in § 2870, the language is just as easily understood

---

[8] Section 2870 is part of California Labor Code Article 3.5, which is titled "Inventions Made by an Employee." That title tends to reinforce—and does not run counter to— what is already suggested by the language of the sections within Article 3.5.

as making explicit what is already implicit in § 2870, forming a coherent whole.

We conclude that, at a minimum, § 2870(a) is nowhere close to clear in applying to post-employment inventions. No case law supports such an interpretation. Moreover, to read it as applying to such inventions, and authorizing temporally unlimited assignment requirements through its exceptions, would produce a conflict with what we think is otherwise the clear prohibition of § 16600 on agreements like the one at issue here. In these circumstances, the duty to harmonize statutes requires reading § 2870(a) not to apply to post-employment inventions.[9]

* * *

For the foregoing reasons, the assignment provision is invalid under § 16600. Accordingly, we reverse the district court's decision that Mr. Alleshouse breached his contract by failing to assign each of the '685, '189, and '433 patents to Whitewater.

## III

The district court entered judgment in Whitewater's favor not only on the contract claim but also on Whitewater's claim for correction of inventorship on the three patents at issue under 35 U.S.C. § 256. Whitewater does not dispute that its interest in correcting inventorship under § 256 depends, in this case, on its acquisition of an ownership interest in the patents based on the assignment provision on which its contract claim rests. Because the assignment provision is invalid, Whitewater's claim under § 256

---

[9]    We need not address the defendants' argument that the Agreement's assignment provision in this case, with its "in any way connected to" and "suggested by" language, extends beyond the exceptions stated in § 2870(a).

necessarily fails.  On that basis, we reverse the judgment on the inventorship claim.

IV

 The judgment of the district court is reversed.  Judgment shall be entered in favor of the defendants.

Costs are awarded to the defendants.

**REVERSED**