# United States Court of Appeals for the Federal Circuit

---

**OMNI MEDSCI, INC.,**
*Plaintiff-Appellee*

**v.**

**APPLE INC.,**
*Defendant-Appellant*

---

2020-1715, 2020-1716

---

Appeals from the United States District Court for the Northern District of California in Nos. 4:19-cv-05673-YGR, 4:19-cv-05924-YGR, Judge Yvonne Gonzalez Rogers.

---

Decided: August 2, 2021

---

THOMAS A. LEWRY, Brooks Kushman PC, Southfield, MI, argued for plaintiff-appellee. Also represented by JOHN S. LEROY, CHRISTOPHER C. SMITH.

JEFFREY PAUL KUSHAN, Sidley Austin LLP, Washington, DC, argued for defendant-appellant. Also represented by JOSHUA JOHN FOUGERE; BROOKE SHANELLE BOLL, Los Angeles, CA; MICHAEL ROBERTS, Dallas, TX; IRENE YANG, San Francisco, CA.

SARAH E. WAIDELICH, Honigman LLP, Ann Arbor, MI, argued for amicus curiae The Regents of the University of

Michigan.  Also represented by J. MICHAEL HUGET; RIAN DAWSON, Detroit, MI.

————————————

Before NEWMAN, LINN, and CHEN, *Circuit Judges.*

Opinion for the court filed by Circuit Judge LINN.

Dissenting opinion filed by Circuit Judge NEWMAN.

LINN, *Circuit Judge.*

In this certified interlocutory appeal, Apple seeks to overturn the denial of its motion to dismiss Omni MedSci's ("Omni") patent infringement complaint for lack of standing.  For the reasons below, we affirm the district court's holding that the University of Michigan ("UM") bylaws did not effectuate a present automatic assignment of Dr. Islam's patent rights and therefore affirm the district court's denial of Apple's motion to dismiss.

## BACKGROUND

Dr. Islam is a tenured professor of electrical and computer engineering at UM.  In 2011, Dr. Islam received an additional appointment to the Cardiovascular Center ("CVC") at UM's medical school.  J.A. 895.  When Dr. Islam joined the UM faculty, he executed an employment agreement that included a provision agreeing to abide by UM's bylaws.  UM Bylaw 3.10, the focus of the issues in this appeal, "stipulates the conditions governing the assignment of property rights to members of the University Faculty and Staff."  J.A. 592.  It provides the disposition of intellectual property under three distinct conditions:

> 1)   Patents and copyrights issued or acquired as a result of or in connection with administration, research, or other educational activities conducted by members of the University staff and supported directly or indirectly (e.g., through the use of University resources or facilities) by funds administered

by the University regardless of the source of such funds, and all royalties or other revenues derived therefrom *shall be the property of* the University.

* * *

4) Patents, copyrights, and property rights in computer software resulting from activities which have received no support, direct or indirect, from the University *shall be the property of* the inventor, author, or creator thereof, free of any limitation which might otherwise arise by virtue of University employment.

5) In cases which involve both University-supported activity and independent activity by a University staff member, patents, copyrights, or other property right in resulting work products *shall be owned as agreed upon* in writing and in advance of an exploitation thereof by the affected staff member and the Vice-Provost for Research in consultation with the Committee on Patents and Copyrights and with the approval of the University's Office of the General Counsel. It is understood that such agreements shall continue to recognize the traditional faculty and staff prerogatives and property rights concerning intellectual work products.

*Id.* (emphases added).

In 2012, Dr. Islam took an unpaid leave-of-absence from UM to "start[] a new Biomedical Laser Company." J.A. 603.[1]   During his leave, Dr. Islam filed multiple

---

[1]    Apple labels the leave an unpaid sabbatical. The label is not determinative of our decision here. We use the phrase "leave of absence" because that is what Dr. Islam communicated to UM in his April 27, 2012 letter. J.A. 603.

provisional patent applications. Upon returning to UM in 2013, he filed non-provisional applications claiming priority to those provisional applications. After those applications issued as patents, Dr. Islam assigned the patent rights to Omni on December 17, 2013 and recorded their assignment with the Patent and Trademark Office. One of those patents is an ancestor of the patents-in-suit here.

Neither UM nor Apple substantively dispute that the patents at issue are not directly related to Dr. Islam's teaching, but rather grew out of his time on leave. In 2013, Dr. Islam requested that UM's Office of Technology Transfer ("OTT") confirm Dr. Islam's ownership of his inventions. OTT denied the request, noting the expenditure of medical school funds to support the cost of Dr. Islam's space and administrative time required to process Dr. Islam's appointment to the CVC. J.A. 895. In internal communications, UM also noted that UM provided "medical school faculty partners who have helped springboard ideas with him." J.A. 885. After a number of communications, various officials at UM—including the Director of Licensing at OTT, the Executive Director of OTT, an Associate Dean at the Engineering School, and the University's Director of Licensing—reiterated that they considered UM to be the owner of the patents and noted that Dr. Islam and Omni considered Omni to be the owner of the patents. Dr. Islam was notified of a formal appeals process to challenge UM's determination of its ownership, but he did not pursue that appeal process.

In 2018, Omni sued Apple in the Eastern District of Texas, asserting infringement of U.S. Patent Nos. 9,651,533 and 9,861,286 (the "asserted patents"). Apple filed a motion to dismiss for lack of standing under Fed. R. Civ. P. 12(b)(1), alleging that UM, not Omni, owned the

asserted patents.[2] Apple argued that Dr. Islam agreed "to abide by all University rules and regulations" including UM bylaw 3.10 when he joined the UM faculty. Apple specifically argued that paragraph 1 of bylaw 3.10 automatically transferred legal title to the patents at issue to UM, leaving Dr. Islam with no rights in the invention to assign to Omni. Apple thus contended that Omni lacked standing to assert the patents against Apple.

The Eastern District of Texas concluded that paragraph 1 of bylaw 3.10 was not a present automatic assignment of title, but, at most, a statement of a future intention to assign. *Omni Medsci, Inc. v. Apple Inc.*, No. 2:18-cv-00134, ECF No. 276 (E.D. Tex. Aug. 14, 2019) ("*District Court Op.*"). The district court thus concluded that dismissal was improper. *Id.* at 1. The case was thereafter transferred to the Northern District of California. Apple filed for reconsideration, which the district court denied, finding "no manifest error" in the Eastern District's decision. *Omni MedSci, Inc. v. Apple Inc.*, No. 19-cv-05924, ECF No. 346 (N.D. Cal. Nov. 25, 2019). Apple filed an unopposed motion for certification of the standing question to this court, which the Northern District granted. ECF No. 354 (Feb. 14, 2020). Apple appeals the denial of dismissal. We have jurisdiction under 28 U.S.C. §§ 1292(c)(1) and 1295.

---

[2] The parties dispute whether instead of filing a Rule 12(b)(1) motion, Apple should have filed a Rule 12(b)(6) motion to dismiss because Apple was asserting only that Omni lacked statutory, not constitutional, standing. Because we affirm the district court's denial of dismissal on the ground that Omni is the assignee of the asserted patents as a matter of law, we do not address this issue. *See Lone Star Silicon Innovations v. Nanya Tech. Corp.*, 925 F.3d 1225, 1235–36 and n.6 (Fed. Cir. 2019).

DISCUSSION

We review the district court's determination regarding patent ownership based on the interpretation of an employment contract de novo. *DDB Techs, LLC v. MLB Adv. Media, L.P.*, 517 F.3d 1284, 1289 (Fed. Cir. 2008). We review any underlying factual determinations for clear error. *Id.* We apply federal law to determine whether the contract here created an automatic assignment or created an obligation to assign, because that question is "intimately bound up with the question of standing in patent cases." *Id.* at 1290.

Omni's standing to assert the patents at issue turns on whether it has an exclusionary right in the asserted patents. This turns on a legal question of contract interpretation: whether paragraph 1 of bylaw 3.10 automatically and presently assigned legal title of Dr. Islam's inventions to UM.[3] A patent assignment clause may presently assign a to-be-issued patent automatically—in which case no further acts to effectuate the assignment are necessary—or may merely promise to assign the patent in the future. *Id.* at 1289. Which type of assignment is intended "depends on the contractual language." *Id.* "In most circumstances, an inventor must expressly grant his rights in an invention to his employer if the employer is to obtain those rights." *Bd. Of Trustees of Leland Stanford Jr. Univ. v. Roche Mol. Sys., Inc.*, 563 U.S. 776, 786 (2011) ("*Roche*"). Further, we

---

[3] Although the district court expressed skepticism about whether the present invention fell within the scope of paragraph 1 of bylaw 3.10, *see District Court Op.* at 11 n. 1, it did not purport to make determinative fact findings with respect to that question, *id.* (noting that its determination that Dr. Islam did not use UM funds to create the invention was "not necessary to the Court's determination"). We need not and do not opine on that question on appeal.

note that the general rule is that rights in an invention belong to the inventor. *Id.* at 785.

We agree with the Eastern District of Texas that paragraph 1 of bylaw 3.10 does not presently automatically assign Dr. Islam's rights to the patent but rather, at most, "reflects a future agreement to assign rather than a present assignment." *See District Court Op.* at 6.

On its face, paragraph 1 of bylaw 3.10 does not unambiguously constitute either a present automatic assignment or a promise to assign in the future. *See id.* It does not say, for example, that the inventor "will assign" the patent rights—language that this court has previously held to constitute an agreement to assign rather than a present assignment. *See Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1580 (Fed. Cir. 1991). Nor does it say that the inventor "agrees to grant and does hereby grant" title to the patent—language that this court has previously held to constitute a present automatic assignment of a future interest. *See FilmTec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1573 (Fed. Cir. 1991) ("*FilmTec I*") (explaining that the contract "expressly granted to the Government MRI's rights in any future invention").

We conclude that paragraph 1 of bylaw 3.10 is most naturally read as a statement of intended disposition and a promise of a potential future assignment, not as a present automatic transfer. This is evident from both the text of bylaw 3.10 taken as a whole and a comparison of the language therein to language interpreted in our precedent. First, by its own terms, bylaw 3.10 merely "stipulates the *conditions* governing the assignment of property rights." J.A. 592. (emphasis added) ("Regents' Bylaws 3.10 stipulates the conditions governing the assignment of property rights to members of the University faculty and staff."). It does not purport to *effectuate* the present transfer of a present or future right.

Second, paragraph 4 of bylaw 3.10 shares the same operative language, "shall be the property of," as paragraph 1, but cannot logically be read as a present automatic assignment. Paragraph 4 directs that patents "resulting from activities which have received no support, direct or indirect, from the University, *shall be the property of* the inventor." J.A. 592 (emphasis added). The only reasonable reading of this operative language is as a statement of an intended outcome rather than a present assignment. To interpret it otherwise would require that the inventor presently automatically transfer title to himself. In general, the identical phrase in two paragraphs of a provision of a contract should be read identically. *See Imation Corp. v. Koninklijke Philips Elects. N.V.*, 586 F.3d 980, 990 (Fed. Cir. 2009) (citing New York state law for the proposition that "[a] proper interpretation of a contract generally assumes consistent usage of terms throughout the Agreement"). *See also Drouillard v. Am. Alternative Ins. Corp.*, 929 N.W.2d 777, 779 (Mich. 2019); *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (noting the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning" (internal citations omitted)). The similar operative language in paragraph 5 of bylaw 3.10, "shall be owned as agreed upon in writing," also cannot reasonably be read as a present automatic assignment of a future right because paragraph 5 explicitly calls for a future determination of ownership after a negotiation between UM and the inventor. *Id.* (emphasis added) ("In cases which involve both University-supported activity and independent activity by a University staff member, patents . . . in resulting work products *shall be owned* as agreed upon in writing."). Apple proffers no convincing reason to read the "shall be" language differently between paragraph 1 on the one hand and paragraphs 4 and 5 on the other. Because the operative language of "shall be the property of" and "shall be owned" cannot be a present automatic assignment in

paragraphs 4 and 5, the same language in paragraph 1 also should not be read as a present automatic assignment.

Third, the language of paragraph 1 of bylaw 3.10 does not use present tense words of execution. Each case in which this court found a present automatic assignment examined contractual language with a present tense executing verb. *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1326 (Fed. Cir. 2010) ("the Employee *assigns* all of his or her right, interest, or title in any invention to the Employer" (emphasis added)); *DDB Techs.*, 517 F.3d at 1290 ("agrees to and *does hereby grant* and *assign*" (emphasis added)); *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000) ("*hereby conveys, transfers, and assigns*" (emphasis added)); *FilmTec*, 939 F.2d at 1570 (MRI "agrees to grant and *does hereby grant* to the Government the full and entire domestic right, title and interest" (emphasis added)). Such present-tense active verbs effectuate a present action. *See DDB Techs.*, 517 F.3d at 1290 n.3 (holding that a contract included a present automatic assignment based on "clear language of the present, automatic assignment provision in the agreement").

The language in the above cases stands in relief against passive verbs in indefinite or future tense. *See Arachnid*, 939 F.2d at 1576 (holding that "shall be the property of [Arachnid], and all rights thereto will be assigned by IDEA . . . to [Arachnid]" was not a present assignment); *FilmTec I*, 939 F.2d at 1573 (distinguishing the present automatic assignment contract at issue from one that "merely obligate[d] MRI to grant future rights"). *See also Chou v. Univ. of Chicago*, 254 F.3d 1347, 1357 (Fed. Cir. 2001) (holding that "[e]very patentable invention . . . shall be the property of the University, and shall be assigned, as determined by the University, to the University" obligated Chou to assign her inventions to the University); *Regents of Univ. of New Mexico v. Knight*, 321 F.3d 1111, 1119–20 (Fed. Cir. 2003) (holding that "such inventions and discoveries belong to the University" obligated the inventors to

assign to the university their inventions and all related pa-
tents and applications).  Looking more specifically at the
exemplary facts in *Arachnid*, the Defendant, Merit, traced
its license rights to patentee Arachnid's contractor.  The
contractor, IDEA, had signed an agreement that included
the following provision:

> Any inventions conceived by IDEA or its employ-
> ees . . . in the course of the project covered by this
> agreement, *shall be the property of* [Arachnid], and
> all rights thereto *will be assigned by IDEA . . .* to
> [Arachnid].

*Arachnid*, 939 F.2d at 1576 (first emphasis added, second
emphasis added by the *Arachnid* court).  This court inter-
preted this provision to be "an agreement to assign, not an
assignment."  *Id.* at 1580.  We see no meaningful distinc-
tion between the language in *Arachnid* and the language
here.  Both use the operative phrase "shall be the property
of" without additional present-tense verbs of execution.
Apple argues that *Arachnid* is distinguishable because par-
agraph 1 of bylaw 3.10 lacks the "will be assigned by" lan-
guage that was key to *Arachnid*'s holding.  We do not agree.
The word "will" in *Arachnid* is used as a command and
statement of intention, just as the word "shall" is here, and
adds nothing to clarify the temporal question before us.
The "shall be the property of" language here lacks the pre-
sent-tense active verb of the first set of cases and follows
more closely the second group of cases.[4]

---

[4]    Contracts are "are interpreted in the light of all the
circumstances" and "as a whole." Restatement (Second) of
Contracts, § 202 (Oct. 2020).  Although the presence or ab-
sence of present language of assignment is an important
indicator of the parties' intent as explained above, we do
not hold that this indicator is necessarily determinative in
all cases.

Fourth, the language in paragraph 1 of bylaw 3.10 stands in contrast to language used by UM's OTT in the Invention Report. That form asks for information about contributors to the invention and includes a declaration referencing bylaw 3.10, which states: "As required, I/we hereby assign our rights in this invention and all resulting patents . . . to the Regents of the University of Michigan." J.A. 1731. This form executes UM's Technology Transfer Policy reporting requirement that itself implements the by-laws. J.A. 605 ("This Policy implements Section 3.10 of the Bylaws of the Board of Regents."); *District Court Op.* at 11. Notably, this form notes that the assignment is "required" rather than previously executed under bylaw 3.10 and uses unambiguous language of present automatic assignment ("hereby assign[s] our rights in this invention"). Apple ar-gues that the Invention Report is merely confirmatory of the prior assignment automatically effectuated by the by-law. But the language of the Invention Report is not lan-guage of confirmation or merely a mirror of the bylaw—it is distinct unambiguous language of present assignment. The language in the Invention Report undermines Apple's position that paragraph 1 of bylaw 3.10 executed an auto-matic assignment, which "no further acts" were required to effectuate, because the unambiguous language of the In-vention Report is itself a further act. *See DDB Techs.*, 517 F.3d at 1290 (quoting *Filmtec I*, 939 F.2d at 1273).

Apple presents several arguments in favor of interpret-ing the contract as a present automatic assignment, but they are unconvincing. Primarily, Apple argues that the "shall be the property of the University" language in para-graph 1 of bylaw 3.10 is similar to language the Supreme Court has categorized as "unambiguously" automatically vesting title. *See Roche*, 563 U.S. at 787 (discussing 42 U.S.C. § 2182,     51 U.S.C. § 20135(b)(1)     and 42 U.S.C. § 5908, all vesting title to intellectual property in the government). Apple argues that two of this court's cases also interpreted "shall" as effectuating a present

automatic conveyance. *See FilmTec Corp. v. Hydranautics*, 982 F.2d 1546, 1548 (Fed. Cir. 1992) ("*FilmTec II*") (interpreting "title to [a subject] invention shall vest in the United States") and *Heinemann v. United States*, 796 F.2d 451, 453. (Fed. Cir. 1986) (interpreting an executive order that "[t]he Government shall obtain the entire right, title and interest in and to all inventions made by any Government employee" as a transfer of legal and equitable title).

These cases are inapposite. In *Roche*, the Supreme Court categorized 42 U.S.C. §§ 2182 and 5908, and 51 U.S.C. § 20135(b)(1) as "providing unambiguously that inventions created pursuant to specified federal contracts become the property of the United States." 563 U.S. at 786. Although each of these statutes uses the word "shall," none of them purports to govern assignments as between private parties. Rather, these statutory provisions specify the *initial vesting* of rights in certain inventions in the government and direct the United States Patent and Trademark Office ("USPTO") to issue patents therefor directly to the government. These are statutory exceptions to the "general rule that rights in an invention belong to the inventor." *Id.* at 785. None of these statutes concerns assignments between private parties. *Id.* at 785.

U.S. Code Title 42, Section 2182, for example, governs inventions related to nuclear materials and states that such inventions "shall be vested in, and be the property of, the Commission" and instructs the Director of the United States Patent and Trademark Office to issue any such patents to the Commission. 42 U.S.C. § 2182. Similarly, 51 U.S.C. § 20135, governs inventions made under contract to NASA and explains that inventions within its purview "shall be the exclusive property of the United States" and directs that any patent thereto "shall be issued to the United States." 51 U.S.C. § 20135(b)(1) and (b)(2). Likewise, 42 U.S.C.§ 5908 explains that title to an invention within the scope of the statute "shall vest in the United States, and if patents on such invention are issued, they

shall be issued to the United States." 42 U.S.C. § 5908(a). The Supreme Court's statement in *Roche* is merely a recognition of the statutory imperative that title to certain patents relating to specified inventions *vests* in the United States. Nothing in *Roche* should be taken as a holding that the word "shall" implies any sort of transfer, immediate or otherwise. Indeed, none of the statutes noted by the Supreme Court addresses how, when or under what circumstances rights in inventions are or shall be conveyed, transferred or assigned as between private parties. *Film-Tec II* is distinguishable for these same reasons. *FilmTec II*, 982 F.2d at 1548 ("[T]itle to [a subject] invention shall *vest* in the United States" (emphasis added)).

In *Heinemann v. United States*, 796 F.2d 451, 456 (Fed. Cir. 1986), this court held that the Commissioner of Patents and Trademarks and the Department of the Army did not act arbitrarily and capriciously or otherwise violate the APA by concluding that Heinemann's invention—made within the course of his employment with the government—was not his property due to the provisions of an Executive Order. Executive Order 10096 stated that the "Government shall obtain the entire right, title and interest in" the subject inventions. *Id.* at 453. According to Apple, because "shall obtain" there made the government the "owner" of the patent, *id.* at 456, bylaw 3.10 here necessarily created a present assignment. Apple is incorrect. The procedural posture in *Heinemann* was a review under the Administrative Procedures Act of a decision delegated to two executive agencies interpreting an Executive Order. This is a far cry from the straightforward interpretation of language in a contract between two private parties. Moreover, the fundamental issue on review in this court in *Heinemann* was whether Heineman could maintain a suit alleging a taking against the government, under circumstances in which the government had at least some form of ownership of the patent being asserted. This court did not consider the nature of the government's ownership (legal

and/or equitable or the timing of the transfer) of the asserted patent, though that issue was referenced by at least one party.[5] *Heinemann* does not help answer the question here of the nature of the assignment contained in bylaw 3.10.

More broadly, Apple cautions that whether an agreement confers an assignment or a mere license "depends on the substance of what was granted rather than formalities or magic words." *See Lone Star Silicon*, 925 F.3d at 1229. Apple's point is well taken. Our focus here is not on any magic words, but rather on the absence of an active verbal expression of present execution in paragraph 1 of bylaw 3.10. The absence of an active verbal expression of present execution is a substantive indication that a present automatic assignment was not intended.

Next, Apple argues that UM's Technology Transfer Policy confirms that bylaw 3.10 is meant to effectuate a present automatic transfer. Apple refers specifically to the section titled "Granting Rights Back to Inventors" and notes that it sets conditions under which the University can "[a]ssign or license *its rights* in University Intellectual Property back to one or more inventors." J.A. 1211, § VI.1 (emphasis added). *See also* J.A. 1207, § II.3 ("University generally will *retain* ownership of Intellectual Property produced by Employees while participating in sabbaticals or other external activities if they receive salary from the University for such activity" (emphasis added)). Omni responds that the Technology Transfer Policy does not explain or indicate how the University obtains its rights—whether by automatic operation of bylaw 3.10 or by a

---

[5]    Adding to the unusual posture of the case, *Heinemann* did, in fact, separately assign the patent to the United States, although that assignment was held invalid, a determination that was not at issue on appeal. *Heinemann*, 796 F.2d at 452.

separate instrument of assignment.  It argues that the "retain" language does not help answer the question of who has the rights in a particular invention.  Omni points to the Invention Report, discussed above, as the actual instrument of transfer, and interprets the provisions of the Technology Transfer Policy implying university ownership as concerning inventions already transferred via the Invention Report or other document of assignment.

We agree with Omni that the Technology Transfer Policy, if anything, supports and does not undermine Omni's position.  While the Technology Transfer Policy indicates that the University "will retain ownership of Intellectual Property produced by Employees while participating in sabbaticals," J.A. 606, it says nothing about how the University obtains its intellectual property.  Furthermore, nothing in the Technology Transfer Policy relies on the operation of bylaw 3.10 to effectuate any transfer of any intellectual property rights.  The "retain" language Apple cites is inapposite to the question of whether paragraph 1 of bylaw 3.10 affects a present automatic assignment.

Finally, Apple argues that Dr. Islam's and the University of Michigan's prior conduct demonstrate a joint understanding that paragraph 1 of bylaw 3.10 executed a present assignment rather than a mere promise to assign.  *See DDB Tech.*, 517 F.3d at 1292 ("[G]eneral contract law [recognizes] . . . that conduct of the parties which indicates the construction that the parties themselves placed on the contract may . . .be considered in determining the parties' true intent.").  In particular, Apple points to a 2007 "re-assignment" letter agreement that Dr. Islam signed with respect to an unrelated patent, stating: "Inventor acknowledges that pursuant to the University's Regents Bylaw 3.10 the Invention and Patents are the Property of the University." J.A. 1155.  According to Apple, this letter showed Dr. Islam's acknowledgment that paragraph 1 of bylaw 3.10 effectuated a present automatic assignment, because Dr. Islam did not otherwise assign the patent discussed

therein.  Omni responds that this letter agreement was a form letter that Dr. Islam reluctantly signed, despite clearly maintaining his belief that he always retained ownership of that patent.  Omni also argues that UM's conduct shows its understanding that paragraph 1 of bylaw 3.10 did *not* effectuate a present automatic assignment because in 2010, UM "waived" any claim to ownership in three provisional applications filed by Dr. Islam but made no offer to assign the rights in the inventions covered by those applications to Dr. Islam.  According to Omni, such an assignment (rather than a waiver) would have been required if bylaw 3.10 had previously effectuated a present automatic assignment thereof to UM.  *See* J.A. 677.  Finally, Omni argues that the parties' conduct with respect to the patents at issue here supports its position: Dr. Islam sought a release rather than a reassignment of the inventions, and UM was at first willing to sign the release before changing its mind.  *See* J.A. 885–86.

The parties' past conduct is not particularly helpful here with respect to the interpretation of paragraph 1 of bylaw 3.10.  Dr. Islam's signing of a letter agreement in 2007 to "reassign" an unrelated patent back to him at the University's request is, at best, weak evidence of his understanding of the scope of bylaw 3.10.  Similarly, the fact that UM "waived" rather than "reassigned" three patent applications in 2010 does not necessarily indicate that UM considered the operation of bylaw 3.10 not to be automatic.  UM was acting under the belief that no University funds or resources were expended in the acquisition of those inventions and that the University therefore did *not* have an ownership claim to  the inventions, regardless of how bylaw 3.10 is read.  Finally, one University official's willingness (later reconsidered) to sign a release rather than a reassignment with respect to the patents at issue here does not necessarily indicate the University's interpretation of bylaw 3.10.  The parties' past conduct does not change our interpretation of the language of the bylaws.

## CONCLUSION

For the foregoing reasons, we conclude that paragraph 1 of bylaw 3.10 is, at most, a statement of a future intention to assign the patents at issue. It did not effectuate a present automatic assignment of title to UM and thus did not negate Dr. Islam's assignment of the inventions to Omni. Accordingly, the district court's denial of Apple's motion to dismiss for lack of standing is affirmed.

**AFFIRMED**

# United States Court of Appeals for the Federal Circuit

---

**OMNI MEDSCI, INC.,**
*Plaintiff-Appellee*

**v.**

**APPLE INC.,**
*Defendant-Appellant*

---

2020-1715, 2020-1716

---

Appeals from the United States District Court for the Northern District of California in Nos. 4:19-cv-05673-YGR, 4:19-cv-05924-YGR, Judge Yvonne Gonzalez Rogers.

---

NEWMAN, *Circuit Judge*, dissenting.

This certified question arises from the suit by Omni MedSci, Inc. ("Omni") against Apple Inc. for patent infringement. Apple presented the defense that Omni does not own the patents in suit because the inventor, Mohammed Islam, is an employee of the University of Michigan, and his employment agreement requires that his inventions and patents are the property of the University. Thus Apple argued that Omni does not have standing to sue for infringement. The district court held that Omni has

standing to sue[1] and my colleagues agree. I respectfully dissent for these patents are the property of the University.

DISCUSSION

"Standing is a constitutional requirement pursuant to Article III." *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1363 (Fed. Cir. 2010). "[T]he touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in the patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury." *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010); *see also Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339−41 (Fed. Cir. 2007) (a party that does not have the exclusionary right lacks constitutional standing).

In the district court Professor Islam did not dispute his obligations to the University under his employment agreement and the University's Bylaws and Technology Transfer Policy; he instead argued that these inventions are not subject to those obligations because the patent applications were not filed with University support. However, the district court did not decide this ground; the court stated: "Having found that Dr. Islam's employment agreement did not operate as an automatic assignment of any patent rights, the Court need not reach the other arguments asserted by Apple." Dist. Ct. Op. at 11.

The district court held that the employment agreement and other University documents did not achieve their intended purpose of assigning inventions and patent rights to the University, despite the decades of implementation of

---

[1]    *Omni MedSci., Inc. v. Apple Inc.*, Nos. 18-CP-00429 and 18-CV-00134 (E.D. Tex 2019) ("Dist. Ct. Op."); and Nos. 4:19-CV-05673 and 4:19-CV-05924 (N.D. Cal. 2020).

that policy.  Thus the district court held that Professor Islam retained ownership of these inventions and that he validly assigned the patents to Omni, a company that he formed for the purpose of exploiting these inventions.  My colleagues affirm the district court's denial of Apple's motion to dismiss for lack of standing.

This ruling is not correct as a matter of contract interpretation, and overturns decades of unchallenged understanding and implementation of the University's employment agreement and policy documents.  Omni does not own these patents and does not have standing to sue for infringement.

**A**

***Prof. Islam's employment agreement requires that patents based on activities supported by the University "shall be the property of the University"***

In August, 1992, Dr. Mohammed Islam was hired by the University of Michigan for the position of Assistant Professor of Engineering and Computer Science, and since November 2011 he has also held an appointment at the Cardiovascular Center of the University's Medical School.  His employment agreement states the University's Bylaw 3.10, including the following text:

> Regents' Bylaws 3.10 stipulates the conditions governing the assignment of property rights to members of the University faculty and staff.  Unless otherwise provided by action of the Regents:
>
> 1)  Patents and copyrights issued or acquired as a result of or in connection with administration, research, or other educational activities conducted by members of the University staff and supported directly or indirectly (e.g., through the use of University resources or facilities) by funds administered by the University, regardless of the source of such

funds, and all royalties or other revenues derived therefrom, ***shall be the property of the University***.

* * *

4) Patents, copyrights, and property rights in computer software resulting from activities which have received no support, direct or indirect, from the University ***shall be the property of the inventor,*** author, or creator thereof, free of any limitation which might otherwise arise by virtue of University employment.

Appx592 (Emphases added).  The employment agreement concludes with:

I agree to abide by the University's rules and regulations.

[Signed] Mohammed N. Islam [Date] 8/7/92 (Appx592).

The patent provisions are elaborated in a University document entitled "Policy on Intellectual Property: Including their Disclosure, Commercialization, and Distribution of Revenues from Royalties and Sale of Equity Interests." This document includes the following:

### II.  Ownership of Intellectual Property

1.  Intellectual Property made (e.g., conceived or first reduced to practice) by any person, regardless of employment status, with the direct or indirect support of funds administered by the University (regardless of the source of such funds) ***shall be the property of the University***, except as provided by this or other University policy.  Funds administered by the University include University resources, and funds for employee compensation, materials, or facilities…

Tech Transfer Policy, Rev. June 1, 2009 (emphasis added) (Appx1207).

In the district court, Omni argued that the inventions and patents at issue were not made with University support, and thus were owned by Professor Islam in accordance with paragraph four of Bylaw 3.10, *supra.* Apple and the University offered contrary evidence and argument. The district court did not decide this question. Instead, the district court held that the University did not own these patents, because "Bylaw 3.10 only addresses existing IP," whereby the contractual provision that patents "shall be the property of the University" "did not operate as an automatic assignment of any patent rights." Dist. Ct. Op. at 11. The court stated that "the only plausible interpretation of Bylaw 3.10 is as a requirement for a future determination and assignment, rather than a present assignment of a future interest." Dist. Ct. Op. at 8.

The district court concluded that Omni owns these patents by valid assignment from the inventor. The panel majority agrees, holding that Professor Islam's inventions made during his employment by the University, and patents thereon, did not automatically become University property because "shall be the property of the University" is stated in the future tense and thus does not automatically assign future inventions. The panel majority holds that the employment agreement "did not negate Dr. Islam's assignment of the inventions to Omni," Maj. Op. at 17.

I cannot agree with my colleagues' interpretation of the employment agreement and University Bylaws and Tech Transfer Policy documents, for this interpretation contravenes these documents' plain meaning and long-understood interpretation.

## B

### *The University's employment agreement, signed when employment starts, necessarily applies to inventions made in the future*

"A contract is read in accordance with its express terms and the plain meaning thereof." *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993). The plain meaning of "shall be the property of the University" is that inventions made during employment and patents thereon shall belong to the University.

The panel majority holds that the University's documents fail to achieve the University's purpose because "shall be the property of the University" is in the future tense and therefore does not establish ownership of future inventions. The majority holds that the employee's "shall be" promise is "merely" a "promise to assign in the future," Maj. Op. at 6, and therefore precludes automatic vesting of property rights when the invention is made.

On this reasoning, the majority holds that ownership of the employee's future inventions is not transferred by "shall be the property of the University" and that University ownership does not automatically vest for inventions made with University support during employment. This holding defeats the purpose of the University's Bylaw and Technology Transfer Policy and contradicts the employment agreement.

The University and Apple cite precedent in which the courts have considered whether an employment agreement provides for ownership by the employer of the employee's future inventions. In *C.R. Daniels, Inc. v. Naztec Int'l Grp., LLC*, 2012 WL 1268623 (D. Md. Apr. 13, 2012), the employment agreement stated that the employee's inventions "shall become the absolute property of" the employer "without further consideration," *id.* at *4, and the court observed that "conspicuously absent from the [agreements] is any

language indicating that some other act had to be performed for the assignments to be completed." *Id.* at *12. The court reasoned that since no assignment mechanism was stated in the employment agreement, the parties intended the automatic vesting of ownership of future inventions, with no need for specific assignment. *Id.* at *16. The University draws analogy between the *C.R. Daniels* agreement's future tense "shall become the absolute property of the employer" and the University's future tense "shall be the property of the University." *See* Appx592.

The University explains that its policy of automatic vesting of employee inventions facilitates University administration of patent and licensing activity and fulfillment of Bayh-Dole obligations. The University points to its implementation of Bylaw 3.10 and the Technology Transfer Policy, by the employment agreement's automatic vesting of University ownership of employee inventions.

The University states that the grammatical usage "shall be the property of the University" is appropriate for inventions and patents not in existence, and is designed to achieve automatic vesting when any invention is made. The University's Director of Licensing, Mr. Bryce Pilz, testifying as the University's Rule 30(b)(6) witness, described this long-established implementation of Bylaw 3.10 and the Technology Transfer Policy. Appx3964, 3965, 3967, 3968, 3971, 3974.

## C

### *The employment agreement signed by Professor Islam conforms to the University's rules and policy*

The University stresses the Bylaw provision whereby employee inventors may request assignment or license back to them of rights to their invention, and the implementing provisions in the Technology Transfer Policy:

8                              OMNI MEDSCI, INC. v. APPLE INC.

**VI.  Granting Rights Back to Inventors**

> 1.  Upon request by one or more Inventors, the University may in its discretion elect to assign or license its rights in University Intellectual Property back to one or more inventors when permissible under University policies, related sponsorship agreements, and/or federal law …

Tech Transfer Policy (Appx4201).  The University points out that such an assignment- or license-back mechanism is necessary because the University has automatic ownership of employee inventions.  The University states that it has granted rights back to inventors, including to Professor Islam for an unrelated invention, and that Professor Islam acknowledged, on receiving the assignment, that:

> B.  Inventor acknowledges that pursuant to the University's Regents Bylaw 3.10 the Invention and Patents are the property of the University.

[Signed] Mohammed N. Islam [Date] 5/23/07 (Appx4137).

Despite this history of consistent and undisputed interpretation and implementation, the majority holds that the documents providing that inventions and patents "shall be the property of the University" are fatally defective, with the result that the employee, not the University, owns the inventions and patents.  The majority reasons that "paragraph 1 of bylaw 3.10 is most naturally read as a statement of intended disposition and a promise of a potential future assignment, not as a present automatic transfer," Maj. Op. at 7.  Thus the majority rules that the employment agreement does not place ownership in the University.

According to my colleagues, this fatal flaw in the University's documents could have been avoided simply by using the present tense "is the property of the University" instead of the future tense "shall be the property of the University."  However, these documents necessarily apply only to future inventions, for which the future tense is

appropriate usage and affords clear understanding.  Indeed, throughout this litigation, neither Professor Islam nor Omni asserted ambiguity or confusion of meaning or intent.  *See, e.g.*, *United States v. Choctaw Nation*, 179 U.S. 494, 531 (1900) ("[A]s a general rule in the interpretation of written instruments the intention of the parties must control, and [] such intention is to be gathered from the words used—the words being interpreted, not literally nor loosely, but according to their ordinary signification.")  *See also Moran v. Prather*, 90 U.S. 492, 499 (U.S. 1875) ("[T]he words of the instrument which have reference to the usual transactions of life must be interpreted according to their plain, ordinary, and popular meaning[.]"); Restatement (Second) of Contracts § 202 (1) (Am. L. Inst. 1981) ("Words and other conduct are interpreted in light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight.").

The explicit provision in the employment agreement notifies the employee of this condition of University employment.  However, the majority holds that despite the undisputed intent and purpose of the University's documents, the district court did not err in sustaining Omni's ownership and its constitutional standing to sue.

Apple and the University point out that the employment agreement has a long history of understanding and performance by the University and its employees, including Professor Islam.  "Conduct of the parties which indicates the construction that the parties themselves placed on the contract may … be considered in determining the parties' true intent." *DDB Techs., LLC v. MLB Adv. Media, L.P.*, 517 F.3d 1284, 1292 (Fed. Cir. 2008) (citation omitted, ellipsis in original).

The University's Director of Licensing testified that the provision "shall be the property of the University" is well understood and has long been applied to effect the

automatic vesting of University ownership of employee inventions. Appx4015 (Pilz Dep. at 219:8−220:5).

## D

### *Precedent illustrates a variety of contractual usages implementing employer ownership of employee inventions*

Employer ownership of employee inventions requires agreement and authorization. Precedent illustrates varied usages for this purpose.

In *FilmTec Corp v. Hydramantics*, 982 F.2d 1546 (Fed. Cir. 1992) the contract with the government stated that any inventions "shall vest in the United States." The court held that "shall vest" means that ownership "immediately vested in the United States by operation of law … when the invention was conceived," without any need for additional assignment or other documentation. *Id.* at 1553. There is no distinction of legal effect between "shall vest in the United States" and "shall be the property of the University."

In *Heinemann v. United States*, 796 F.2d 451 (Fed. Cir. 1986), an Executive Order concerning ownership rights in inventions "creat[ed] the presumption that [the] Government shall obtain the entire, right, title and interest in the invention" made by a Government employee. *Id.* at 453. The court held that "his invention became the property of the Government" although not affirmatively assigned. *Id.* at 456.

In *Affymetrix, Inc. v. Illumina, Inc.*, 446 F. Supp. 2d 292 (D. Del. 2006), a consulting contract stated that "The Work Product … produced by Consultant under this Agreement and all proprietary rights therein shall be the exclusive property of ARI." *Id.* at 294. The court held that the consulting agreement effected "a present assignment of future interests and that, upon conception, legal title to the invention was transferred [] by operation of law," *id.* at 297,

referring to the mutual understanding and contractual intent of the parties. There is no distinction of legal effect between "shall be the exclusive property of ARI" and "shall be the property of the University." Both achieve the intended automatic transfer of ownership.

In *Alzheimer's Institute of America, Inc. v. Avid Radiopharmaceuticals*, 2011 WL 3875341 (E.D. Pa. Aug. 31, 2011) the employment agreement stated: "An invention which is made in the field of discipline in which the employee is employed by the University [of Pennsylvania] or by using University support is the property of the University." The court held that the University's property right vests automatically when the invention is made. *Id.* at *7, *10.

Some of the agreements discussed in precedent use the present tense favored by the majority. In *SiRF Technology, Inc. v. International Trade Commission*, 601 F.3d 1319, 1326 (Fed. Cir. 2010), the employment agreement states: "The Employee assigns all of his or her right, interest, or title in any Invention to the Employer …." The court held that "[b]y using the language 'Employee assigns,' the agreement expressly grants rights with no further action needed on the part of the employee." *Id.*

In *Preston v. Marathon Oil Co.*, 684 F.3d 1276, 1288 (Fed. Cir. 2012) the court held that "[b]ecause the assignment clause in the April Employee Agreement states that the employee agrees to and does 'hereby assign' all 'Intellectual Property,' it is an express assignment of rights in future inventions, and automatically assigned rights to Marathon without the need for any additional act." The panel majority herein approves of the usage "does hereby assign," as free of the "shall be" future tense defect.

An agreement to execute a future assignment is seen in *Advanced Video Techs. LLC v. HTC Corp.*, 879 F.3d 1314 (Fed. Cir. 2018), where the agreement states that the employee

> will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and will assign to the Company all my right, title, and interest in and to any and all inventions, original works of authorship, developments, improvements or trade secrets which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the employ of the Company.

*Id.* at 1317 (emphasis omitted). The court held that this provision is not an automatic assignment, that a separate assignment document is required, and that such assignment to the employer is obligatory. *Id.* at 1317−18. The court enforced the obligation to assign, in conformity to the agreement.

Another variant is seen in *Chou v. University of Chicago*, 254 F.3d 1347 (Fed. Cir. 2001), where the employment agreement provided that the employee's inventions "shall be the property of the University, and shall be assigned, as determined by the University, to the University, to an organization sponsoring the activities, or to an outside organization deemed capable of administering patents." *Id.* at 1357. The court held that this provision created an obligation in Chou to assign, but that assignment to the University is not automatic because an intermediate step requires the University to identify the assignee.

In *Regents of the University of New Mexico v. Knight*, 321 F.3d 1111 (Fed. Cir. 2003), an employment agreement requiring the employee inventor to cooperate in the patent prosecution process, and an assignment of a parent patent application stating that the inventor does "sell, assign, and transfer unto [UNM] all right, title, and interest" in the patents and "in and to any and all divisions, reissues, continuations, and extensions thereof" vested ownership in the

University and was "more than sufficient" to obligate the employee to assign the invention to the University, for the contract established that the employee's inventions are the property of the University. *Id*. at 1119–20.

In overview, a provision that inventions "shall be assigned" to the employer is generally deemed to require a separate assignment document, as in *Arachnid, Inc. v. Merit Industries, Inc.*, 939 F.2d 1574, 1580 (Fed. Cir. 1991). And a provision that inventions are or shall be the property of the employer is generally deemed to vest ownership by operation of law. Precedent implements that the focus is on contractual intent, *see* Restatement (Second) of Contracts § 202 (Am. L. Inst. 1981):

> (1) Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight… ;
>
> \* \* \*
>
> (3) Unless a different intention is manifested, (a) where language has a generally prevailing meaning, it is interpreted in accordance with that meaning; (b) technical terms and words of art are given their technical meaning when used in a transaction within their technical field… ;
>
> \* \* \*
>
> (5) Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade.

Restatement, § 202.

Professor Islam entered into an employment agreement that used the words "shall be the property of the University." This is an unambiguous statement of intended and agreed ownership. It is not disputed that the purpose of Bylaw 3.10 is to establish University ownership of

14                                          OMNI MEDSCI, INC. v. APPLE INC.

inventions made with University support.  It cannot reasonably be concluded that the parties intended that Professor Islam would nonetheless own inventions made with University support. *See Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 229 (6th Cir. 2019) ("Under Michigan law, the primary goal in the construction or interpretation of any contract is to honor the intent of the parties") (internal quotation marks and alteration omitted).

The interpretation of employment contracts, including obligations of employer and employee with respect to ownership of inventions and patents, is a matter of state contract and property law. *See Jim Arnold Corp. v, Hydrotech Sys., Inc.,* 109 F.3d 1567, 1572 (Fed.Cir.1997) ("[T]he question of who owns the patent right and on what terms typically is a question exclusively for state courts.").  The Federal Circuit is in accord with Michigan law that the inquiry as to meaning of contract terms "depends on the substance of what was granted rather than formalities or magic words.*" Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1229 (Fed. Cir. 2019).  When contract "provisions are clear and unambiguous, they must be given their plain and ordinary meaning." *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993).  The usage "shall be the property of the University" supports no plain and ordinary meaning other than that the University is vested as owner when the property comes into being.

It is noteworthy that Professor Islam did not invoke the formal "Appeal Process" provided in the Technology Transfer Policy.  It is also noteworthy that Professor Islam does not argue that these inventions were made during his 4-month leave of absence; he stated in his request for leave: "I intend during the period to focus on fund-raising for the new company, setting its technical direction, and pulling together the foundational intellectual property."  Letter "RE: Request for Leave of Absence Fall 2012," February 7,

2012 (Appx4085). He filed seven patent applications during that period, and two more within two weeks thereafter.

Professor Islam's agreement that patents on inventions supported by the University "shall be the property of the University" defeats his purported assignment to Omni. Even on the majority's "conclu[sion] that paragraph 1 of bylaw 3.10 is most naturally read as a statement of intended disposition and a promise of a potential future assignment," Maj. Op. at 7, this conclusion precludes validly assigning these patents to an entity other than the University.

"[T]he person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue." *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1032–33 (Fed. Cir. 1995) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990). Since it is necessary for Omni to show that "it held enforceable title to the patent at the inception of the lawsuit," *Abraxis*, 625 F.3d at 1364, Omni does not have standing to bring these infringement suits.

From the court's contrary ruling, I respectfully dissent.